IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                 Criminal No. 1:15cr60-HSO-JCG

SHERRIE BOX BENNETT and
JERRY DEAN BENNETT

### ORDER DENYING DEFENDANT SHERRIE BOX BENNETT'S [104] MOTION FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY, MOTION FOR NEW TRIAL PURSUANT TO RULES 29 AND 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, AND DENYING DEFENDANT JERRY DEAN BENNETT'S [103], [105], [109] MOTIONS FOR JOINDER IN [104] MOTION

BEFORE THE COURT are the Motion [104] for Judgment of Acquittal or Alternatively, Motion for New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure filed by Defendant Sherrie Box Bennett, and the Motions for Joinder [103], [105], [109] filed by Defendant Jerry Dean Bennett. These Motions are fully briefed. After considering the Motions, the record as a whole, and relevant legal authority, the Court finds that the Motion [104] for Judgment of Acquittal or Alternatively, Motion for New Trial, and the Motions for Joinder [103], [105], [109] should all be denied. Neither Defendant is entitled to a judgment of acquittal or a new trial.

## I. BACKGROUND

A.    Factual background

Defendant Sherrie Box Bennett ("Ms. Bennett") worked as a registered nurse at Biloxi Radiation Oncology Center (the "Clinic") with Dr. Laurence Lines ("Dr.

Lines"). Ms. Bennett also worked as office manager and essentially ran the Clinic. At some point, Dr. Lines began to suffer symptoms of dementia. According to the Government, Ms. Bennett began exerting power over Dr. Lines' personal and business affairs.

Beginning at least as early as 2010, prescriptions using Dr. Lines' name were being written to Ms. Bennett, her husband Defendant Jerry Dean Bennett ("Mr. Bennett"), and others in the Bennetts' family. The Government maintains that some prescriptions were written by Dr. Lines himself, but that he was not aware of what he was doing. Other prescriptions were issued using Dr. Lines' rubberstamp signature, while still others were called into pharmacies by Ms. Bennett.

On November 22, 2011, Biloxi Radiation Oncology Center, LLC, filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code. *In re Biloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, Petition [1] (Bankr. S.D. Miss. Nov. 22, 2011). The Clinic initially remained a debtor-in-possession. On May 7, 2013, the United States Trustee filed a Motion to Convert or Dismiss, or Alternatively, to Appoint a Chapter 11 Trustee because "the Debtor ha[d] shown gross mismanagement of the Debtor's affairs . . . ." *In re Biloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, Mot. [304] (Bankr. S.D. Miss. May 7, 2013).

Attorney Kimberly R. Lentz was appointed as the Chapter 11 trustee in the bankruptcy proceeding. *In re Biloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, Order [336] (Bankr. S.D. Miss. June 10, 2013). In a separate Order, the Bankruptcy Court also ordered that Trustmark National Bank dishonor any check

-2-

presented for payment that was made payable to Dr. Lines or Ms. Bennett. *In re Biloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, Order [337] (Bankr. S.D. Miss. June 10, 2013). The Bankruptcy Court required Trustmark to remove Dr. Lines and Ms. Bennett as authorized signatories on any existing debtor-in-possession account. *In re Biloxi Radiation Oncology Center, LLC*, No. 11-52727-KMS, Order [355] (Bankr. S.D. Miss. June 11, 2013).

On June 17, 2013, Ms. Lentz, as trustee, filed an adversary proceeding against Ms. Bennett. *Lentz v. Bennett*, No. 13-05024 Compl. [1] (S.D. Miss. June 17, 2013). The adversary complaint asserted claims against Ms. Bennett based upon her alleged gross mismanagement of the debtor's financial affairs and her alleged transfer of debtor assets to herself and to Dr. Lines, over which Ms. Bennett subsequently took control. *Id.*

B.   Procedural history

On August 4, 2015, a federal grand jury returned an 11-count Indictment [3] against Ms. Bennett and Mr. Bennett (collectively, "Defendants"). On April 5, 2016, the Grand Jury returned a First Superseding Indictment [42]. Count 1 of the First Superseding Indictment [42] charged Ms. Bennett and Mr. Bennett with conspiring to distribute and dispense controlled substances outside the scope of professional practice as prohibited by 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846. 1st Superseding Indictment [42] at 1. Counts 2 through 11 charged that Defendants knowingly and intentionally distributed and dispensed a controlled substance outside the scope of professional practice on separate occasions between

-3-

January 9, 2012, and April 5, 2013, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *Id.* at 1-5. Counts 12 through 14 charged Ms. Bennett alone with bankruptcy fraud, specifically knowingly and fraudulently appropriating to her own use, embezzling, spending, and transferring property of a debtor's bankruptcy estate in violation of 18 U.S.C. § 153. *Id.* at 5-6.

The jury trial of this criminal case was set to commence on Tuesday, July 19, 2016, at 9:00 a.m. On Thursday, July 14, 2016, at 6:34 p.m., Ms. Bennett's counsel filed a Motion for Trial Deposition [60]. Ms. Bennett asked the Court, pursuant to Federal Rule of Criminal Procedure 15, to permit her to depose Dr. Frank Pitruzzello, a Radiologist Oncologist who works in Mobile, Alabama, before trial commenced. Mot. [60] at 1-2. Ms. Bennett sought to use Dr. Pitruzzello's deposition testimony at trial. The Government filed a Response [61] in opposition to the Motion [60]. On July 15, 2016, the Court entered an Order [63] denying Ms. Bennett's Motion [60].

The jury trial began on July 19, 2016, and continued through July 29, 2016. After the Government rested its case-in-chief, Defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The Court denied Ms. Bennett's Motion, and granted in part and denied in part Mr. Bennett's Motion. The Court dismissed Counts 7, 8, 10, and 11 of the First Superseding Indictment as to Mr. Bennett. Order [80] at 2.

At the close of trial, the jury deliberated on July 28 and 29, 2016, and on July 29, 2016, returned a verdict of guilty as to Ms. Bennett on the charges contained in

Counts 1-14 of the First Superseding Indictment, and a verdict of guilty as to Mr. Bennett on the charges contained in Counts 1-6 and 9 of the First Superseding Indictment.

After being granted additional time to do so by the Court, on September 29, 2016, Ms. Bennett filed the present Motion [104] for Judgment of Acquittal or Alternatively, Motion for New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  Mr. Bennett filed Motions for Joinder [103], [105], [109], which evidence his joinder in Ms. Bennett's Motion and which essentially seek the same relief.  The Government filed Responses [106], [107] in opposition to Defendants' Motions, without the benefit of a transcript.  Ms. Bennett filed a Reply [108], in which Ms. Bennett recited sections of the trial transcript, and Mr. Bennett joined [109].

On October 21, 2016, the Court entered a Text Order directing the Government to respond on or before October 31, 2016, to the specific citations to the record contained in Ms. Bennett's Reply [108].  On October 27, 2016, the Government filed a Motion [122] for Extension of Time, requesting until November 8, 2016, to respond.  The Court granted the Government's Motion [122] by Text Order entered on October 28, 2016.

On October 29, 2016, the Government filed its Response [123], which does not specifically address all of the record citations set forth in the Reply [108].  Nor did the Government cite any legal authority in the majority of the sections of its Reply [108].  However, the Government's lack of response as to all of the issues raised by

Defendants does not preclude the Court's review of these issues. *United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999) (quoting *United States v. Rosa*, 434 F.2d 964, 966 (5th Cir. 1970)).

Defendants contend that the Court should set aside their convictions or order a new trial for the following reasons:

(1) The Court erred in failing to grant Defendants' Motions for Judgment of Acquittal at the close of the Government's case-in-chief;

(2) The Court erred in omitting certain jury instructions;

(3) The Court erred by not granting Ms. Bennett's Motion to Quash the Indictment for Prosecutorial Misconduct;

(4) The Court erred in denying Ms. Bennett's ore tenus and written Motions for Mistrial;

(5) The Court erred in denying Ms. Bennett's Motion to obtain a pretrial deposition;

(6) The Court erred in denying Ms. Bennett's Motion for permission to enter a medical storage facility to secure evidence;

(7) As for Counts 12, 13, and 14 of the First Superseding Indictment [42], the Court erred in instructing the jury in the disjunctive, rather than the conjunctive, under 18 U.S.C. § 153(a);

(8) Prosecutorial misconduct in the prosecutor's opening and rebuttal closing arguments mandates a judgment of acquittal or a new trial;

(9) The verdict should be set aside or a new trial granted because of alleged deficiencies in the discovery provided by the Government;

(10) The Court exhibited judicial bias; and

(11) Defendants have acquired new evidence, specifically the testimony of Anita Bonner Cotton.

Having considered Defendants' Motion on the merits, Defendants are not entitled to the relief they seek.

## II. DISCUSSION

### A. Relevant legal authority

Federal Rule of Criminal Procedure 29(c)(1) provides that a defendant may move for judgment of acquittal, or renew such a motion, after the jury returns a

guilty verdict.  *See* Fed. R. Crim. P. 29(c)(1).  "[A] motion for a judgment of acquittal is a challenge to the sufficiency of the evidence to sustain a conviction."  *United States v. Uvalle-Patricio*, 478 F.3d 699, 701 (5th Cir. 2007).  In considering the sufficiency of evidence supporting a criminal conviction, the Court

> reviews the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc).

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a). The Fifth Circuit has

> stressed that motions for new trial are generally disfavored, *see United States v. Eghobor*, 812 F.3d 352, 363 (5th Cir. 2015), and that district courts have wide discretion with respect to Rule 33 motions, *see United States v. MMR Corp.*, 954 F.2d 1040, 1047 (5th Cir. 1992) (citing *United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983)).

*United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016).  Such motions "must be reviewed with great caution."  *United States v. Smith*, 804 F.3d 724, 734 (5th Cir. 2015) (quoting *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011)).

> In this Circuit, the generally accepted standard is that a new trial ordinarily should not be granted "unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004) (citing *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir.1997)).  "A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant." *Id.* (citation omitted).

*United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011).

B.   The Court did not err in failing to grant Defendants' Motions for Judgment of Acquittal at the close of the Government's case-in-chief.

At the close of the Government's case-in-chief, both Defendants moved for judgment of acquittal.  *See* Tr. [115] at 131-43.  The Court denied Ms. Bennett's Motion, but granted in part and denied in part Mr. Bennett's Motion.  *See id.* at 190-94.  The Court dismissed counts 7, 8, 10, and 11 as to Mr. Bennett.  *Id.* at 194. Defendants now assert that the Court "errored [sic] in failing to find that the government's evidence lacked sufficiency."  Mot. [104] at 2.

Defendants were both charged in Count 1 with conspiracy to distribute and dispense controlled substances outside the scope of professional practice, specifically Oxycodone, Oxymorphone, Hydrocodone and Alprazolam, in violation of 21 U.S.C. § 846.  As the Court instructed the jury, the elements of this offense are: (1) that two or more persons, directly or indirectly, reached an agreement to distribute or dispense a controlled substance outside the scope of professional practice; (2) the defendant knew of the unlawful purpose of the agreement; (3) that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose; and (4) that the overall scope of the conspiracy involved Oxycodone, Oxymorphone, Hydrocodone and Alprazolam.  Tr. [116] at 230-31.

Counts 2 through 11 charged Defendants with knowingly and intentionally distributing and dispensing a controlled substance outside the scope of professional practice, in violation of 21 U.S.C § 841(a)(1) and 18 U.S.C. § 2.  These controlled substances included Oxycodone, a Schedule II narcotic drug controlled substance (Counts 2-4, 9); Hydrocodone, a Schedule III narcotic drug controlled substance

(Counts 5, 7, 10-11); Alprazolam, a Schedule IV non-narcotic drug controlled substance (Count 6); and Oxymorphone, a Schedule II narcotic drug controlled substance (Count 8).  For the jury to find Defendants guilty of this crime, the Government had to prove each of the following beyond a reasonable doubt as to each Defendant: (1) that the Defendant distributed or dispensed a controlled substance; (2) that the Defendant acted knowingly and intentionally; (3) that the substance distributed or dispensed was in fact the substance charged in the respective count of the Indictment; and (4) that the Defendant was distributing or dispensing for other than a legitimate medical purpose and outside the usual course of professional practice.  Tr. [116] at 232-33.

Counts 12-14 charged that Ms. Bennett, as an agent and employee of Biloxi Radiation Oncology Center, LLC, knowingly and fraudulently appropriated to her own use, embezzled, spent, and transferred property belonging to the debtor's bankruptcy estate in violation of 18 U.S.C. § 153.  According to the First Superseding Indictment, the property at issue consisted of a Trustmark Bank check number 1372 in the amount of $16,636.00 dated January 25, 2013, as to Count 12; a Trustmark Bank check number 1422 in the amount of $10,000.00 dated March 22, 2013, as to Count 13; and a Trustmark Bank check number 1445 in the amount of $28,000.00 dated April 3, 2013, as to Count 14.

As the Court instructed the jury, to find Ms. Bennett guilty of any of these charges, the Government had to prove each of the following beyond a reasonable doubt:

First, that on or about November, 2011, continuing through July, 2013, a bankruptcy case docketed as Case Number 11-52727, substantively consolidated with Case Number 11-52820, was pending in the United States Bankruptcy Court for the Southern District of Mississippi, and Biloxi Radiation Oncology Center, LLC was the Debtor;

Second, that the property described in the indictment was part of the bankruptcy estate of the Debtor;

Third, that defendant Sherrie Box Bennett had access to the property by virtue of her participation in the administration of the bankruptcy estate as an agent and employee of the debtor-in-possession of the bankruptcy estate; and

Fourth, that defendant Sherrie Box Bennett knowingly and fraudulently embezzled, spent, transferred, or appropriated to defendant Sherrie Box Bennett's own use property belonging to the bankruptcy estate.

Tr. [116] at 236-37.

The Court has reviewed the record. Considering the evidence and all reasonable inferences in the light most favorable to the prosecution both at the time Defendants made their *ore tenus* Motions for Judgment of Acquittal at trial and at the close of all evidence at trial, the Court concludes that a rational trier of fact could have found each of the essential elements beyond a reasonable doubt with respect to the charges contained in Counts 1 through 14 of the First Superseding Indictment as to Ms. Bennett, and in Counts 1-6 and 9 of the First Superseding Indictment as to Mr. Bennett. *See Vargas-Ocampo*, 747 F.3d at 303. Defendants are not entitled to any relief on this basis.

C.   The Court did not err in omitting certain jury instructions.

Defendants next maintain that the Court erred by "fail[ing] to grant the defendants' preemptory [sic] instruction and other more specific defining instructions which addressed issues such as good faith defense, specific intent

regarding fraud, and address regulations versus the law." Mot. [104] at 2.

Defendants sought an instruction directing the jury that "merely failing to follow

regulations and guidelines, while evidence, was not enough, standing alone, to

convict." *Id.* at 11. According to Defendants, "[t]his was important to the Bennetts

because the prosecutor tried so hard to merge this in the mind of the jury to obtain

a conviction for the alleged failure to follow regulations." *Id.*

> The Government responds that
>
> the Court properly instructed the jury and defendant makes no credible argument as to why she was entitled to additional instructions. Defendant, throughout the trial continued to make reference to the medical regulations, which set out the standard of care, as mere "guidelines." These regulations are binding on medical practitioners and in fact, through the regulatory scheme, determine whether an otherwise valid prescription is not valid. *See United States v. Brown*, 553 F.3d 768 (5th Cir. 2008) (admissibility of regulations). An invalid prescription is a violation of 21 U.S.C. § 841(a)(1). Defendant's instruction was unnecessary and did not accurately reflect the law.

Resp. [106] at 2.

> The Fifth Circuit has held that
>
> [a] district court abuses its discretion in omitting a requested jury instruction only if the requested language "(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense."

*United States v. Lucas*, 516 F.3d 316, 324 (5th Cir. 2008) (quoting *United States v.*

*Simkanin*, 420 F.3d 397, 401 (5th Cir. 2005)).

Defendants maintain that several instructions should have been given by the

Court, including a peremptory instruction "to find the defendant, Sherrie Bennett,

Not Guilty, with respect to all counts of the indictment." Proposed Instruction D(1) No. 1 [104-1] at 4. There was no basis in law or fact for this peremptory instruction. Nor did either Defendant raise an objection at trial to the Court omitting this instruction from its final jury instructions. *See* Tr. [116] at 124-29.

Defendants also argue that the following instruction should have been given by the Court:

> During the trial, you have received evidence regarding certain regulations, rules and guidelines. Even though the use of a rubber stamp in lieu of a physician's signature and/or the failure to keep a medical chart when prescribing certain controlled substances and/or telephonically calling in a schedule II controlled substance to a pharmacy may be inappropriate or a violation of the rules, such an act is not done in violation of the offense unless it was done corruptly or if it was intended at the time it is done with the specific intent to violate the elements of the crimes charges [sic] as set forth in these jury instructions.
>
> Furthermore, if the defendant has a good faith belief that she/he was acting in accordance with the proper rules, regulations and guidelines, then that good faith belief is a defense to the crime charged.

Proposed Instruction D(1) No. 2 [104-1] at 5.

This jury instruction was not an accurate statement of the law, and the Court correctly refused it. Acting "corruptly" was not an element of any of the charges, and giving this instruction would only have served to confuse and mislead the jury. The federal regulation to which the Government referred at trial, *see* 21 C.F.R. § 1306.04(a), is considered an interpretative regulation, and the Government charged and proved violations of the appropriate criminal statutes, not merely the related regulations, *United States v. Brown*, 553 F.3d 768, 791 & n.71 (5th Cir. 2008) (citing *United States v. Ogle*, 201 F. App'x 979 (5th Cir. 2006)). The "use of duly issued

regulations in clarifying the scope and contour of criminal law" is "irreproachable" and "commonplace." *Id.*

> As the Fifth Circuit has explained,
>
> [t]o convict the defendants of illegally dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1), the Government was required to prove "(1) that [they] . . . dispensed a controlled substance, (2) that [they] acted knowingly and intentionally, and (3) that [they] did so other than for a legitimate medical purpose and in the usual course of [ ] professional practice." *United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986) (quoting *United States v. Rosen*, 582 F.2d 1032, 1033 (5th Cir. 1978)). The third element is not expressly required by the text of § 841, but relevant regulations provide that a controlled substance can be dispensed by a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

*United States v. Armstrong*, 550 F.3d 382, 396-97 (5th Cir. 2008), *overruled in part on other grounds by United States v. Balleza*, 613 F.3d 432, 433 n.1 (5th Cir. 2010). "Both prongs [of the regulation] are necessary for a prescription to be legitimate . . . ." *Id.* at 397. In accordance with that regulation, "a practitioner is unauthorized to dispense a controlled substance if the prescription *either* lacks a legitimate medical purpose *or* is outside the usual course of professional practice." *Id.* (emphasis in original).

At trial, the Government referenced and introduced the Mississippi State Board of Medical Licensure's rules and regulations as Exhibit "G-31," the Mississippi State Board of Medical Licensure's Administrative Code as Exhibit "G-31a," and the Mississippi Board of Pharmacy's regulations as Exhibit "G-32." As the United States District Court for the Eastern District of Louisiana has explained,

-13-

in order to prove guilt under the statute, the government is allowed to produce evidence that the defendant violated state regulations on medical practice. While violation of a state statute regulating medical practice would not be evidence of guilt *per se* under the [Controlled Substances Act], these violations remain persuasive and relevant, particularly if the government can show a pattern of consistent violations.

*United States v. Prejean*, 429 F. Supp. 2d 782, 801-02 (E.D. La. 2006), *aff'd sub nom.*

*Armstrong*, 550 F.3d at 382.

The Court's jury instructions included an accurate statement of the law, including a correct statement of what constitutes "good faith." Tr. [116] at 234. The lack of an additional good faith defense instruction did not prevent Defendants from presenting a good faith defense, nor did it preclude the jury from considering such a defense. Moreover, Defendants did not raise an objection to the Court's failure to include this instruction in the final jury instructions. *See* Tr. [116] at 124-29.

Defendants also assert that the following instruction should have been given:

Even though giving a judge something of value may be inappropriate or a violation of the ethical rules, such an act is not done corruptly so as to constitute a bribery offense unless it is intended at the time it is given to affect a specific action the judge officially will take in a case before him, or may take in a case that may be brought before him.
    A gift or favor bestowed on a judge solely out of friendship, to promote good will, or for motive wholly unrelated to influence over official action does not violate the bribery statutes.

Unnumbered Proposed Instruction [104-1] at 6. There was no legal or evidentiary basis to support giving this particular jury instruction, and it was wholly irrelevant to the offenses charged in this case. Defendants also did not raise any objection at trial to the Court omitting this instruction. *See* Tr. [116] at 124-29.

Defendants' Motion, to the extent it is premised upon the failure to give the

-14-

foregoing particular jury instructions, is not well taken and should be denied.

D.     The Court did not err in denying Ms. Bennett's Motion to Quash the
       Indictment for Prosecutorial Misconduct.

Defendants contend that the Court committed reversible error when it

overruled a Motion seeking to "quash[ ] the indictment for prosecutorial

misconduct." Mot. [104] at 2. It appears that Defendants are referring to Ms.

Bennett's Motion to Quash Indictment [39], which was filed on February 16, 2016,

and which sought to quash the original Indictment [3]. Ms. Bennett's Motion [39]

challenged information the Government included in its Motion to Disqualify [32]

Defendants' previous counsel, some of which was included in a subsequent

newspaper article [39-1].

Defendants have not offered any additional argument in support of their

position that the Court erred in denying Ms. Bennett's Motion [39]. For the same

reasons stated in the Court's previous Order [41] denying Ms. Bennett's Motion to

Quash [39], the Court finds that Defendants' present Motion [104] should be denied

as to this issue.

E.     The Court did not err in denying Ms. Bennett's ore tenus and written
       Motions for Mistrial.

Defendants contend that the Court should have granted a mistrial on

grounds that their Fifth Amendment rights were violated during trial. Mot. [104]

at 2-5. According to Defendants,

> 1. The first time that the Bennetts' 5th amendment right was violated,
> was when the Mississippi attorney general's officer, Jamie Thompson,
> testified that he began his involvement in the case at bar when he was
> contacted by the DEA and Mississippi Bureau of Narcotics, and asked to

investigate the Bennetts, and he testified in the government's case in chief on direct, that when they attempted to question the Bennetts at their home,[1] that the Bennetts advised that they did not want to speak because they had an attorney and that Mr. Bennett (alleged coconspirator of his wife, Sherrie) slammed the door in their face. This was a violation of their 5th amendment constitutional rights.[2]

2. The second time that Sherri [sic] Bennett's constitutional rights were violated was when the bankruptcy trustee, Lentz, testified in the government's case in chief, on direct, that she instituted adversarial proceedings against Sherrie Bennett, in bankruptcy court, "seeking relief with regard to some fraudulent transfers, the (3) checks she has [sic] written in spring of 2013,[']"[3] but when the court tried to have a hearing, that Sherrie Bennett "said that she wanted to have a lawyer present" and refused to address the claim.

*Id.* at 4. According to Defendants, as to the second purported violation,

[t]his violation was further emphasized by the fact that the government had previously established, with an earlier witness, Chris Steiskal,. . . that the bankruptcy judge chastised her for trying to file a pleading while not being an attorney, and informed her that she would be referred to the authorities. Thus, she was already on notice that she was being criminally accused, which was magnified by the testimony of Lentz. While there was no objection to Steiskal's comment, the defendants will submit that there also was no claim that Sherrie Bennett asserted her 5th amendment right to not address the bankruptcy judge's charge.

*Id.* at 5 n.4. Defendants maintain that their objection was not to the failure of

---

[1]  According to Defendants, "[t]he questioning and investigation was regarding the narcotic counts for which the Bennetts were eventually arrested, and included in the indictment in the case at bar (Counts 1 – 11)." Mot. [104] at 4 n.1.

[2]  Defendants claim that "[t]he trial judge, when overruling the objection, opined that the investigation the witness was discussing during trial had nothing to do with the charges before the court. Defendants respectfully submit that the record contradicts said opinion, and even if the welfare of Dr. Lines was the issue, and even if that issue was a different possible criminal charge, the government argued, from Voir Dire to the final closing argument, the allegations concerning the Bennetts' alleged treatment of Doctor Lines was a central component of its case before the jury." Mot. [104] at 4 n.2.

[3]  According to Defendants, these are "[t]he exact same three (3) checks for which she was indicted in the case at bar (i.e. Counts: 12, 13, 14)." Mot. [104] at 4 n.3.

either to receive any *Miranda* warnings, but "the government's production of direct evidence to make the Bennetts appear guilty because they decided to 'hide' behind an attorney rather than respond to the allegations." *Id.* at 5 (footnote omitted).

Jamie Thompson ("Mr. Thompson") works with the Office of the Attorney General for the State of Mississippi, supervising a unit that deals with the investigation of abuse, neglect, and financial exploitation of vulnerable persons in the State of Mississippi. Tr. [112] at 236. Mr. Thompson was contacted about Dr. Lines by an agent with the Mississippi Bureau of Narcotics who was assigned to the Drug Enforcement Administration's Diversion Division and by someone from the Mississippi Board of Medical Licensure. *Id.* at 238. Mr. Thompson, another investigator from his office, and Beth Zoeller from Adult Protective Services visited Dr. Lines' home to assess its condition. *Id.* at 239-40.[4]

Mr. Thompson testified that he had no contact with Jerry Bennett on this particular day. *Id.* at 249. However,

> [t]here was another occasion that we went by there actually to try to interview the Bennetts in their home, and Mr. Bennett, Mr. Jerry Bennett, was actually the one who said, you know, *We have nothing to say*, and slammed the door in our face, so that was the end of our conversations with them. He informed us that he did have an attorney, and so we respected his right to counsel and didn't –

*Id.* at 249-50. Ms. Bennett's counsel then objected at sidebar, outside the hearing of the jury.

---

[4] Thompson explained that Adult Protective Services is responsible for the social services aspect of such an investigation, while his unit with the Attorney General's office was involved with the criminal investigation aspects of a complaint. Tr. [112] at 240.

Christopher Steiskal ("Mr. Steiskal") is a trial attorney with the Office of the United States Trustee in Jackson, Mississippi.  Tr. [112] at 190.  At trial, Mr. Steiskal testified about the January 13, 2012, "341 hearing" that he conducted in the bankruptcy case, and  that he had subsequently filed a motion in the bankruptcy case to convert the case to a Chapter 7 proceeding, dismiss the case out of bankruptcy, or appoint a Chapter 11 trustee.  *Id.* at 191-94, 199, 207-08.

Mr. Steiskal further testified as to a June 6, 2013, hearing where United States Bankruptcy Judge Katherine Samson inquired about a handwritten pleading submitted by Ms. Bennett.  *Id.* at 210-13.  According to Mr. Steiskal, Judge Samson asked Ms. Bennett if she was an attorney, and Ms. Bennett responded "no."  *Id.* at 212.  Mr. Steiskal's testimony continued as follows:

> [Q.]   And so what happened with that motion?
> A.     Well, the Court asked her if she was an attorney; she answered no. And the Court stated that this document would be stricken from the record because it was not filed by an attorney and that the Court would, you know, refer Ms. Bennett to the proper authorities for -- because by filing a document and not being an attorney, you're practicing law without a license.
> Q.     All right.  Did the Court enter an order regarding that ruling?
> A.     Yes.  The Court entered a subsequent order striking the --striking this document.

*Id.* at 213.  Defense counsel did not lodge a contemporaneous objection to this testimony.

Ms. Lentz is a bankruptcy attorney and Chapter 7 panel bankruptcy trustee. Tr. [113] at 68.  Ms. Lentz testified as to the rarity of appointing a trustee in a Chapter 11 bankruptcy case, her appointment in the Clinic's bankruptcy case, and her filing of an adversary complaint against Ms. Bennett in the bankruptcy

proceeding along with a motion for preliminary injunction. *Id.* at 68, 90-93. When

Ms. Lentz was asked, "what did you do after this motion was filed?  Was an order

entered?," she responded,

> [t]here was a -- yes, there was a -- well, what happened -- I believe what
> happened was is that when we -- we went to the bankruptcy court to have
> a trial, and there's -- Ms. Bennett showed up and said that she wanted to
> have a lawyer present, and so rather than entering a preliminary
> injunction --

*Id.* at 93.  Ms. Bennett's counsel raised an objection and made an ore tenus motion,

which was heard outside the presence of the jury.  *Id.*

Although Defendants assert that their objection is not based upon *Miranda*,

at trial Ms. Bennett's counsel argued that Mr. Thompson had violated Mr. Bennett's

Fifth Amendment right to remain silent and failed to read Mr. Bennett his *Miranda*

rights.  Tr. [112] at 250-51.  Defense counsel also cited the case "*Hale v. State*" as a

ground for mistrial.[5]  *Id.* at 251.  The Court denied the request for a mistrial and

gave a curative instruction.  *Id.* at 252.  During Ms. Lentz's testimony, counsel also

objected regarding Ms. Bennett requesting an attorney at an adversary bankruptcy

proceeding.  The Court overruled this objection.  *See* Tr. [113] at 93-96.

Later that same day, after the lunch break, the Court instructed the jury as

follows:

> In a moment, we're going to resume the direct examination of Ms. Lentz.
> Before we do that, I did want to clarify one thing that occurred earlier.
> When Ms. Lentz was testifying, there was an objection Mr. Crosby made
> about a statement that Ms. Lentz made about her believing that Ms.

---

[5] The Court believes counsel may have been referring to *United States v. Hale*, 422 U.S.
171 (1975).

Bennett had an attorney at the bankruptcy proceeding.  I just want to make sure I explain to you that that statement is not relevant, and so I direct you to disregard it.  It has really nothing to do with what we're here on.  So I want to make sure that we're clear on that.

*Id.* at 106.

Ms. Bennett then filed a Motion for Mistrial [72], which the Court denied. *See* Order [77] at 1; *see also* Tr. [115] at 81-87.  The Court determined that Defendants' reliance upon *Hale* and *Miranda* in this context was misplaced, and that there was no right to counsel as to either Defendant at the relevant times.  Tr. [115] at 82-87.

Defendants have not cited any additional legal authority in support of these grounds to their Motion.  For the reasons the Court stated on the record at trial, Defendants' requests for mistrial were properly denied.

F. <u>The Court did not err in denying Ms. Bennett's Motion to obtain a pretrial deposition and denying Ms. Bennett's Motion for permission to enter a medical storage facility to secure evidence.</u>

Defendants assert that the Court erred by denying Ms. Bennett's Motion for Trial Deposition [60] filed on Thursday, July 14, 2016, at 6:34 p.m., and her Motion Requesting Order Allowing Attorney and Client to Visit Premises and Inspect Records [64] filed on Sunday, July 17, 2016, at 9:18 p.m.  Mot. [104] at 2, 5-7.

The jury trial in this matter was scheduled to, and did, commence on July 19, 2016, at 9:00 a.m.  As for the requested trial deposition, the Court was not persuaded that Ms. Bennett had shown that exceptional circumstances existed or that she should otherwise be allowed to depose Dr. Pitruzzello on the eve of trial. Order [63] at 3 (citing Fed. R. Crim. P. 15(a)(1)).  Nor did the Court find that the

interests of justice compelled such a last-minute deposition. *Id.* Moreover, Ms.

Bennett had not shown that Dr. Pitruzzello was unavailable to testify at trial

within the meaning of the Federal Rules of Evidence, such that any such deposition

testimony would have been inadmissible. *Id.* at 3-4 (citing Fed. R. Evid. 804(a)).

The Court is not persuaded that any of Defendants' arguments change this result.

    As for Ms. Bennett's request to visit the premises of a medical storage facility

and inspect records, the Court found that the Motion [64] was grossly untimely

under the Court's Trial Order [49], and that Ms. Bennett had not shown good cause

for the delay in making her request. Order [69] at 4-7 (citing Fed. R. Crim. P.

12(c)(3); U.L. Cr. R. 47(H)). The Court also determined that

> while Defendant frames her Motion as one to inspect the premises of the
> Medical Centers, Defendant in substance appears to be seeking particular
> categories of documents from those facilities, as stated in her Motion [64].
> Defendant has not adequately explained why she has not issued, or could
> not issue, a subpoena for these documents through the normal procedure,
> or why any such procedure has not provided, or would not provide, Ms.
> Bennett with the relief she now seeks.

*Id.* at 7 (citing Fed. R. Crim. P. 17).

    For the same reasons stated in the Court's prior Orders [63], [69], the Court

did not err in denying Ms. Bennett's Motions [60], [64].

G.    <u>The Court did not err in instructing the jury in the disjunctive, rather than
      the conjunctive.</u>

    Ms. Bennett asserts that the Court "allowed the government to constructively

amend the indictment by virtue of the jury instructions that allowed the jury to

convict in the disjunctive rather than the conjunctive." Mot. [104] at 2. Ms.

Bennett appears to argue that her right under the Fifth Amendment to a grand jury

indictment was violated based upon a purportedly constructive amendment to the First Superseding Indictment.

At issue are Counts 12, 13, and 14 of the First Superseding Indictment [42], which each charged that on separate occasions Ms. Bennett "knowingly and fraudulently appropriated to her own use, embezzled, spent, *and* transferred property" of the bankruptcy estate. 1st Superseding Indictment [42] at 5 (emphasis added). The text of the relevant statute, 18 U.S.C. § 153(a), uses the disjunctive "or," rather than the conjunctive "and." *See* 18 U.S.C. § 153(a). The jury was therefore instructed that the fourth element of these offenses was that Ms. Bennett "knowingly and fraudulently embezzled, spent, transferred, *or* appropriated to [her] own use property belonging to the bankruptcy estate." Tr. [116] at 237 (emphasis added).

"The Fifth Amendment guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment." *United States v. Arlen*, 947 F.2d 139, 144 (5th Cir. 1991). "The indictment cannot be broadened or altered except by the grand jury." *Id.* (quotation omitted). "A constructive amendment occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which [he or] she was charged." *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010) (quotation omitted). "A constructive amendment violates the defendant's right under the Fifth Amendment to a grand jury indictment."

*Id.* (quotation omitted).

The Fifth Circuit has stated, however, that "[i]t is well-established in this Circuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Holley*, 831 F.3d 322, 328 n.14 (5th Cir. 2016) (quoting *United States v. Haymes*, 610 F.2d 309, 310 (5th Cir. 1980)).  Even if an "indictment list[s] . . . different ways of violating [a statute] using 'and' rather than 'or,' the Government still only ha[s] to prove that [defendant]" violated the statute in one of these possible ways.  *Id.* at 328.  The Court therefore properly instructed the jury using the disjunctive, and there was no constructive amendment to the First Superseding Indictment.  Defendants' Motion on this ground should be denied.

H.   <u>The prosecutor's statements in his opening statement and closing argument do not mandate a judgment of acquittal or a new trial.</u>

Defendants complain about several comments made by the prosecutor during the course of his opening statement and closing argument.  The United States Supreme Court has explained the federal prosecutor's role in the criminal justice system as follows:

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor-indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has

> confidence that these obligations, which so plainly rest upon the
> prosecuting attorney, will be faithfully observed. Consequently, improper
> suggestions, insinuations, and, especially, assertions of personal
> knowledge are apt to carry much weight against the accused when they
> should properly carry none.

*Berger v. United States,* 295 U.S. 78, 88 (1935)*; see also United States v.*

*Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990).

The Court's goal is to make a criminal trial "a neutral arena for the

presentation of evidence upon which alone the jury must base its determination of a

defendant's innocence or guilt . . . ." *United States v. Carter*, 953 F.2d 1449, 1460

(5th Cir. 1992) (quoting *United States v. Garza*, 608 F.2d 659, 662 (5th Cir. 1979)).

The Fifth Circuit has therefore "condemned suggestions that evidence not presented

at trial would compel a finding of guilty" and "efforts to create the impression that

the government, which possesses a 'vast investigatory network' and whose

determinations may both have a stamp of credibility and invoke jurors' loyalty, has

already made an extrajudicial determination of guilt . . . ." *Id.*

The Fifth Circuit generally applies "a two-step analysis to claims of

prosecutorial misconduct." *United States v. Weast*, 811 F.3d 743, 752 (5th Cir. 2016)

(quotation omitted). The Court first assesses "whether the prosecutor made an

improper remark. If so, then [the Court] ask[s] whether the defendant was

prejudiced." *Id.* (quotation omitted). According to the Fifth Circuit,

> [t]he prejudice step sets a high bar . . . . The determinative question is
> whether the prosecutor's remarks cast serious doubt on the correctness
> of the jury's verdict. [The Fifth Circuit] generally look[s] to three factors
> in deciding whether any misconduct casts serious doubt on the verdict:
> (1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2)
> the efficacy of any cautionary instruction by the judge, and (3) the

strength of the evidence supporting the conviction.

*Id.* (quotation omitted).

"In attempting to establish that a prosecutor's improper comments constitute reversible error, the criminal defendant bears a substantial burden." *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001). The Court must "test the magnitude of the prejudicial effect of the prosecutor's remarks by considering them in the context of the trial and attempting to ascertain their intended effect." *Id.* at 291. The prosecutor's argument "must be considered in light of the argument to which it responded." *United States v. Canales*, 744 F.2d 413, 424 (5th Cir. 1984).

"A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Valas*, 822 F.3d 228, 243 (5th Cir. 2016). "A prosecutor's argument is reversible error only when so improper as to affect a defendant's substantial rights." *Id.* (quoting *United States v. Vaccaro*, 115 F.3d 1211, 1215 (5th Cir. 1997)). "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)); *see also United States v. Smith*, 814 F.3d 268, 276 (5th Cir. 2016). If a "prosecutor's misconduct substantially affected the fairness, integrity, and public reputation of [the] proceedings, a new trial is warranted." *Smith*, 814 F.3d at 277.

Here, Defendants challenge several statements made by the prosecutor in his opening statement and closing argument. The Court addresses each in turn.

1.     <u>The prosecutor's statement that Defendants could have subpoenaed</u>
       <u>medical records, even if improper, did not affect Defendants'</u>
       <u>substantial rights.</u>

Defendants argue that the prosecutor engaged in misconduct in his rebuttal

closing argument when he asserted that Defendants

> could have subpoenaed medical records, which was an improper shifting
> of the burden of proof upon the defense, and further, it was misconduct
> due to the misrepresentation of the facts, intentionally, because the
> prosecutor was well aware of the difficulty in securing the attendance of
> the above referenced doctor, and the efforts made by the defense to secure
> the medical records he claimed did not exist . . . .   The prosecutor did not
> merely comment upon the failure of the defense to produce the records,
> which was improper, but he also misrepresented the truth, in that he
> claimed that the records did not exist.  He also made himself a witness by
> making such a statement of fact, which was beyond mere argument.

Mot. [104] at 7.

The Government responds that

> [w]hile qualifying the statement that the defense has no burden at all,
> the prosecution pointed out, quite correctly, that the defendant has the
> subpoena power of the Court and could have produced witnesses and
> documents, if any existed, that would have corroborated their defense.
> It is more than a fair inference that such failure was due to the absence
> of such evidence.

Resp. [106] at 2.  The Government states that

> Defendants' claim that because the prosecution knew that defendant had
> attempted to rummage through storage facilities the weekend before trial
> and, according to their counsel, had tried to subpoena Dr. Petrocelli and
> had been denied the ability to take a last minute deposition, the
> prosecution was acting falsely.  If this argument held any water, defense
> strategy in all such cases where there is no evidence supporting their
> claims should be to wait until the very last minute before trial to seek
> evidence, whether it exists or not, have its requests denied because of
> tardiness, and thereby preclude the prosecution from noting the lack of
> any corroborating evidence.  Allowing such tactics would turn defense
> counsels' dilatoriness into brilliant trial strategy.

-26-

*Id.* at 2-3 n.3.

According to Defendants, "the government's own witness, Lentz, testified during the direct that Ms. Bennett told her about off-premises storage of medical records . . . ." Reply [108] at 23. The Government responds that

> [t]he defendant here conflates the fact that there was a medical storage facility with the question of whether there were medical files that would have proven that Dr. Lines was competently practicing medicine during the relevant time frame. The government was not then and is not now aware of any medical files that would have shown what defense alleges.

2d Resp. [123] at 4.

During his initial closing argument, the prosecutor argued that through 2011, 2012, and 2013, "[y]ou didn't see any medical records from any person that Dr. Lines treated during this period. Not one, ladies and gentlemen. Not a single one." Tr. [117] at 11. "[T]here's [sic] no records that show he was treating anyone." *Id.* No reference was made at this point to any failure of Defendants themselves to produce evidence or to the ability of Defendants to subpoena records. The prosecutor simply pointed to the overall lack of such evidence in the record before the jury.

In Ms. Bennett's closing argument, Ms. Bennett's counsel argued in relevant part as follows:

> Mr. Meynardie said, "Well, they didn't produce medical records" and, "They didn't produce this." Well, you know, remember, they -- it's their burden to produce records. If they want to rebut, they have the power, unlimited power, and authority to rebut anything.

*Id.* at 37.[6]

In rebuttal, the prosecutor responded that

it's absolutely true that the defense has no burden whatsoever to put on any evidence. None. They don't have to put on a witness, they don't have to put on a document, they don't have to do anything. But nothing stops them from it. Nothing stops them from issuing a subpoena for the bank [sic] records they claim that the government hid from you.

**MR. CROSBY:**     I'm going to object that he's now trying to shift the burden by that improper rebuttal. I'm objecting to that. And also the prosecutor -- I don't want to make a speaking objection, but the Court is aware of rule -- request rulings, and he cannot say something that's not correct.

**THE COURT:**     All right.

**MR. MEYNARDIE:**     I haven't -- Your Honor, I haven't attempted to shift the burden. I will not shift the burden. The burden belongs to the government, and I have never tried to shift the burden.

**THE COURT:**     All right. Well, ladies and gentlemen, you've been instructed more than once, and I remind you again, the defendants are under no obligation to present any evidence whatsoever. So remember that at all times. Go ahead, Mr. Meynardie.

**MR. MEYNARDIE:**     They don't have to put on anything, but they have subpoena power. And the reason we didn't put on any of those patient records or any of those patients is because they don't exist. We asked the clinic -- and I think there's actually a document in there where the clinic responded to a subpoena where we were asking for them and they said, "We don't have them."

**MR. CROSBY:**     Your Honor, I've got -- I have to object because of what he just -- the subpoena power and ruling of the Court. He cannot make a misstatement. And he's now mis- -- I don't --

**THE COURT:**     Well, I know what you're talking about, Mr. Crosby, and if we need to address that at sidebar, we will, but I think -- I know what the rulings are. And under the rulings, then, there's no -- I would overrule the objection to the extent that issue is being raised. Again, ladies and gentlemen, no inference whatsoever can be drawn from the fact the defendants may or may not have produced any evidence whatsoever. They are under no obligation to do so. All right? Go ahead.

**MR. MEYNARDIE:**  They're not under an obligation, but they can.

---

[6]  Despite the use of quotation marks employed in the transcript, Defense counsel's version of the Government's closing argument does not contain direct quotes from the argument.

*Id.* at 99-101.

When discussing the Clinic's response to the Government's subpoena for records, the prosecutor did not reference a specific exhibit number, but it appears the one to which he was referring was Exhibit "G-61." This exhibit is a letter from Cedar Lake Oncology, one of the clinics where Ms. Bennett and Dr. Lines had worked, to the prosecutor responding to a July 13, 2016, subpoena requesting clinical records for seven specific individuals: Henry D. Box, Jo D. Box, Tracy Box, James Box, Dorothy Bennett, Sherrie Bennett, and Jeffrey [sic] Bennett. *See* Ex. "G-61." The Clinic's letter states that "[o]n searching the clinic files, the above listed individuals do not have a medical record at the Radiation Oncology Clinic." *Id.*

There is no one specific item of evidence in the record that the Court has located which indicates that the Government sought every medical file from Cedar Lake Oncology, where Dr. Lines was treating patients in 2011, 2012, or 2013, and was told by the Clinic in response that there were none, as the prosecutor suggested. However, a prosecutor may discuss during closing arguments "properly admitted evidence and any reasonable inferences or conclusions that can be drawn" from the evidence presented at trial. *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). Based upon the evidence presented at trial by the Government, a reasonable inference or conclusion could be drawn that there were no medical records presented at trial to indicate that Dr. Lines was treating patients during the time periods relevant to this case. *See id.*

-29-

As for the statement regarding the Clinic's response to the Government's subpoena, even if Defendants have shown that the prosecutor's statements on this subject were incorrect or improper, they have not shown prejudice. First, the Court instructed the jury more than once that "[t]he questions, statements, objections, and arguments made by the lawyers are not evidence." *See* Tr. [116] at 224; *see also* Tr. [110] at 25, 26; Tr. [115] at 99; Tr. [117] at 3, 109. Juries are presumed to follow a court's instructions, *United States v. McCarty*, 36 F.3d 1349, 1355 (5th Cir. 1994), and there was no indication here that the jury did not follow this instruction.

Any prejudicial effect from the prosecutor's statements was minimal, and there was substantial evidence presented against Defendants during trial. In this nearly two-week trial, the jury heard almost six full days of testimony from 35 different witnesses, and received over 200 exhibits which were admitted into evidence. The Government presented incriminating evidence regarding Dr. Lines' competency, the control both Defendants exerted over Dr. Lines, the records for improperly issued prescriptions for controlled substances written to or for both Defendants, and the funds which Ms. Bennett surreptitiously obtained from the Clinic's bankruptcy estate through Dr. Lines. Ms. Bennett testified on her own behalf, and the jury heard and obviously rejected her version of events relating to the controlled substance prescriptions and the bankruptcy estate's property.

Where there are "numerous witnesses, pieces of evidence, and issues placed before the jury," the Fifth Circuit has declined to say that "the prosecutor's statements overshadowed what had come before and unduly prejudiced the

[defendants'] case." *United States v. Gallardo–Trapero*, 185 F.3d 307, 320 (5th Cir. 1999). The Court also acted to mitigate any prejudicial effect by instructing the jury to base their decision "solely on the legally admissible evidence and testimony." Tr. [116] at 225. Accordingly, based upon the record as a whole, the prosecutor's remarks did not prejudice Defendants' substantive rights. *Gallardo–Trapero*, 185 F.3d at 321.

With respect to the prosecutor's statements about any power Defendants had to issue subpoenas, the Fifth Circuit has stressed that it does

> not approve of comments reflecting on the lack of evidence presented by a defendant in a criminal case . . . . Such a course of action is a parlous one at best, of necessity sailing close to implying that the defendant is obligated to produce evidence of his innocence.

*United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990) (quotation omitted).

In this case, however, the prosecutor's comments in rebuttal were in response to defense counsel's closing argument. Specifically, counsel for Ms. Bennett argued that it was the Government's burden to produce records, and if the Government "want[s] to rebut, they have the power, unlimited power, and authority to rebut anything." Tr. [117] at 37.

After reviewing the prosecutor's comments and the context in which they were made, the Court concludes that the comments did not result in an impermissible shift of the burden of proof in this case. "The comments were merely a response to defense counsel's arguments that the government failed to produce" certain items of evidence. *United States v. Virgen-Moreno*, 265 F.3d 276, 292 (5th

Cir. 2001).

Furthermore, the Court gave a clear instruction to the jury that the Government had "the burden of proving each defendant guilty beyond a reasonable doubt," Tr. [116] at 223, and that "the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence," *id.* at 227. During the prosecutor's argument, the Court provided further curative instructions, reiterating that the defense had no burden whatsoever to put on any evidence at trial and that no inference whatsoever could be drawn from the fact that Defendants may or may not have produced any evidence. Tr. [117] at 100-101.

Even if improper, the Court finds that the prosecutor's comments were not so egregious as to rise to the level of reversible error because Defendants' substantive rights were not affected. *See Anchondo-Sandoval*, 910 F.2d at 1238. The Court gave appropriate cautionary instructions following the prosecutor's remarks, and the general instructions to the jury further underscored the Government's burden. *See id.* "Whatever prejudice may have resulted from the improper comments should have been neutralized by the [C]ourt's instruction." *Id.*

2.  <u>The prosecutor's comments which arguably bolstered credibility of witnesses, even if improper, did not affect Defendants' substantial rights.</u>

Defendants argue that the prosecutor injected his own credibility into his rebuttal arguments thereby bolstering the credibility of certain witnesses, including that of the Bankruptcy Trustee, Kim Lentz, and Government agents who testified.

Mot. [104] at 7-8; Reply [108] at 24, 33 (citing *United States v. Gracia*, 522 F.3d 597, 600 (5th Cir. 2008)).  According to the Government, in its rebuttal the prosecutor "addressed Mr. Bennett's counsel's outrageous claim that the case was manufactured and that the government agents and the prosecutor fabricated the case to advance their careers."  2d Resp. [123] at 5.

During Ms. Bennett's counsel's closing, he argued as follows with respect to Ms. Lentz's profiting from the bankruptcy:

> Even Kim Lentz, who met with [Dr. Lines], she claims that whenever she fired Dr. Lines and Sherrie, that they -- that they left but she called Dr. Lines back in, in all her detailed notes, for which she was paid ungodly hundreds of thousands of dollars, her, her husband, and junior, paid all these hundreds of thousands of dollars that she can't even remember how much they were paid it was so much, getting paid, you know, hundreds of thousands to do what Sherrie Bennett got no extra money to do, by the way.  You know, Sherrie Bennett's money never went up.  She was paid -- her salary was set all the way back in the Dahlhauser days, but when she had to take on this new task of bankruptcy issues, she got no extra pay.  But even Kim Lentz did not write down a single note in all her detailed notes that there was something wrong with Dr. Lines, because that clearly would be an issue that you should address.  That would be of concern with anybody.
>
> \*   \*   \*
>
> Now, two months later at the final hearing in the bankruptcy, they're talking about the fact that they got – they talk -- they start talking about, you know, paying this back and what's going on, and they decide to appoint Kim Lentz.  You know, keep in mind that the decisions made there are by a civil standard, by a preponderance of the evidence, not beyond a reasonable doubt.  And also Ms. Lentz would not have been there if Sherrie Bennett was there.  She gets appointed, she makes hundreds of thousands of dollars for her family and her firm, but they get zero if Sherrie Bennett is there and if Dr. Lines is there.
>
> \*   \*   \*
>
> You know, you saw a few weeks after Ms. Lentz took over that the -- they tried to put the $1.5 million money from BP, that would have saved the company, that would have taken it out of bankruptcy, Ms. Lentz wouldn't have gotten hundreds of thousands of dollars because it would have been out of bankruptcy, but the money -- all the work Sherrie did to get that

-33-

BP money available would have saved it.  Dr. Lines could have kept his employees, kept his company going, but the trustee, they put a hold on that and kept it in bankruptcy.

Tr. [117] at 54, 65, 70.

As for Mr. Bennett's counsel, he argued in closing as follows as to Ms. Lentz:

As Mr. Meynardie told you, it's a doctor's case, but no doctors are charged. Why are we here?  I can tell you several hundred thousand reasons we're here, maybe half a million reasons we're here.  We're here because Kim Lentz stood to make a lot of money for her and her firm, over $300,000 between her and her husband.  She said, "I worked on the case 18 months."  That didn't mean she worked every day, y'all. Remember, she's going to 341 hearings, she's having other hearings, she's doing other things.  That might have been a few hours a month.  It took 18 months to close the case out, but she made over $300,000.  That's the reason we're here, and that's why this case is fabricated.  That's why they called Dr. Fineburg and got that letter that when I asked him, "Who did you write this to?"

"Oh, I don't know.  I'm forgetting now."

He was starting to get forgetful.  He couldn't tell us anything about that letter, and it's been three years ago.  He could remember stuff ten years ago, but he couldn't remember stuff three years ago.

[Ms. Lentz] gets that letter, she calls Stan Ingram up at -- I don't know if he was in the Attorney General's Office.  She calls DHS.  She puts all this in motion.  Then they go and kidnap Dr. Lines.

And you know what's funny?  She writes her notes and she talks June 10th, June 11th, June 12th I think in her notes, which she agreed they were hers, made them contemporaneously with when it happened. She alleged -- this is funny -- she alleged Jerry was at the clinic.  Nobody else saw him there.  In fact, you know the strange thing?  She couldn't identify him.  I've never seen that ever in a trial.  Every time a witness takes the stand and the government is questioning them "Can you identify that person?" every time they said, "It's the lady in the green blouse, blue blouse, the gray hair."  She couldn't identify him.  So now somebody that made such an impression on her and that was at the clinic that day and she knows it, though she didn't write it down -- she wrote everybody else down that was there -- she can't recognize.  You know what I think?  She thought it might be me or she thought it might be Jerry.  She didn't know.  She didn't want to pick the wrong one because she hadn't seen him before.  But that's Ms. Lentz's position.

And then on the next day, June 12, 2013, what's her first line? And I read it to Ms. Lentz, and she agreed it said that.  She said eight

o'clock Cheryl Shoemaker and Dr. Lines come in the clinic to do what? To treat. She doesn't say Cheryl is there. She said Dr. Lines came in the clinic to treat. And then three weeks later, 19 days later, they get Fineburg to write this letter because they figure out that the best thing to do here, the way to prolong this bankruptcy, the way to keep the business from being sold, is to get Sherrie out of the picture and let Kim Lentz run it and make a bunch of money.

I can think of another 300-plus thousand of reasons that this case is here. And y'all remember from his own mouth, Dr. Burleson didn't have a job. He was going to have to go locum tenens to Texas. His family's over here. He didn't want to do that. If he could stay here, he gets $325,000 a year. I don't quibble with that amount. I wish the practice of law was that good. But that's another reason. And then him and Kim Lentz establish a relationship, and this thing has just been snowballing ever since.

Kim Lentz made money off this one little case, not her whole practice, the amount of money that most of us take three, four, or five years to earn. That's a pretty good reason to do it, isn't it? That's why we're here, y'all.

And then it's after that snowball starts rolling down the hill, after Kim Lentz takes over, after the FBI gets involved, the DEA, Attorney Generals, DHS and whoever else more gets involved, that all of a sudden Dr. Lines is demented.

They can't even say it's Alzheimer's. They give you a note from Dr. Fineburg, who is a fine physician, by the way. He's treated some of y'all. He's treated my family. He's a fine physician. They get a note from him and they -- his records that said, "We discussed Alzheimer's." Then I think it's Dr. Owens, whoever that doctor was out at Garden Park that ran the Seasons department, he says, "No, we never could classify it as Alzheimer's. He was just demented." But nobody remembered that until after Kim Lentz got involved in this case. Not a single note.

All these doctors, they tell you, concerned about Dr. Lines, concerned he doesn't know what he's doing, concerned he's going to hurt a patient, yet nobody does anything about it. You know, they tell you about how powerful this device is. I mean, you've got to have a geiger counter, for Pete's sake. Pretty strong stuff, can cause a lot of damage. And they don't do anything about it? Way back in 2010, 2009 when he was opening the clinic, they don't do anything then. Then it gets a lot worse. 2011, they don't do anything about it. They let him keep operating it. It's not until after Kim Lentz gets involved that they decide that Dr. Lines has a problem. *Let's go get the medical records. Let's go start putting our case together. Let's take him to Seasons, get him out of there in seven days. Let's do this, let's do that.* And they create the trail, the rabbit trail, that they want you to go down today. That's what they

did, all at Kim Lentz's behest.  And eventually the federal government gets in and gets involved and here we are, playing with people's life for $300,000.

*Id.* at 82-86 (emphasis in original).

With respect to the Government agents involved in the case, Mr. Bennett's

counsel argued that

[a]ll -- most of the government's witnesses have a stake in this case. You've got Agent Grunwald.  This is a performance.  They grade you. That's how you get promoted, the more convictions you get.  That's how the DEA works.  That's how you go from regular agent up to field agent up to I don't know all the -- all the different ranks, but you do it by having successes.
　　　And then all these people have a bias.  And I'm not saying it in a bad sense.  I want FBI agents to do their job.  I want DEA agents to do their job.  I want police to do their job.  I want safe streets.  I don't have a problem with that.  And them having a bias is because they take it on, but they have a bias.  And they're here because either they believe, wrongfully, or they just sunk their teeth in it so bad that they've got to get a conviction of Jerry Bennett, no matter what it takes.  That's called bias.  And all their witnesses have a bias; saving jobs, making money, keeping jobs, being afraid of the federal government, afraid they might do something to you if you don't act like they want you to.  And then there are -- and they testified.  They told you everything Mr. Meynardie and Ms. Jones wanted you to hear.

*Id.* at 86-87.

In rebuttal, the prosecutor responded to defense counsel's arguments, stating

that

I'm not going to go into all what Vice-president Biden would call malarkey that you just heard, but we also heard, and I can't not address it, some of the most offensive things I have ever heard in a courtroom.
　　　Mr. Carlisle's theory of the case is that we're only here, the case was fabricated, because Kim Lentz wanted to make money.  That's all the reason we're here.  I charged this case.  I didn't charge it because Kim Lentz made some money.
　　　And then he came and said to you not only was the case fabricated, but these agents got on the stand and the prosecutor only did this

because we gotta get a conviction, no matter what . . . . . And for them to suggest that, that these agents are getting on the stand solely in order to promote their careers and they're going to do whatever it takes, is the most offensive thing I think I've ever heard in a courtroom.

*Id.* at 99.

The Fifth Circuit has explained that a prosecutor's attempt to vouch for a Government witness's credibility is concerning because it "impl[ies] that the prosecutor has additional personal knowledge about the witness and facts that confirm the witness's testimony, and [adds] to the witness's testimony the influence of the prosecutor's official position." *United States v. Carter*, 953 F.2d 1449, 1460 (5th Cir. 1992). "While [the Fifth Circuit has] sometimes permitted bolstering arguments that specifically respond to attacks on witness credibility, such arguments must draw only on evidence before the jury." *Bowen*, 818 F.3d at 191.

Considered as a whole, the prosecutor's comments regarding "some of the most offensive things I have ever heard in a courtroom" and "Mr. Carlisle's theory of the case is that we're only here, the case was fabricated, because Kim Lentz wanted to make money," Tr. [117] at 99, could suggest to a reasonable listener that the prosecutor was offended because defense counsel questioned the Bankruptcy Trustee Lentz's integrity, credibility, and motives with respect to Ms. Bennett in the bankruptcy action. These comments could arguably be construed as vouching for Lentz's integrity and lending credibility and the influence of the prosecutor's official position to Lentz's testimony. Moreover, the comments regarding "offensive things" the prosecutor had heard in the courtroom were not drawn only upon evidence that was before the jury. *See Bowen*, 818 F.3d at 191.

As for the prosecutor's statements about the Government agents, when defense counsel asserts that agents are either lying or mistaken, a prosecutor is entitled to rebut the assertion. *United States v. Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011). "However, the prosecutor [has] a responsibility not to go beyond the evidence and to make his comments appropriate in scale." *Id.* It is improper to make a largely emotional appeal to the jury to credit agents' testimony because they are agents. *Id.*

While the prosecutor here did state that it was "the most offensive thing I think I've ever heard in a courtroom" for defense counsel to suggest that the "agents are getting on the stand solely in order to promote their careers and they're going to do whatever it takes" to get a conviction, Tr. [117] at 99, the Court cannot say that this was a purely or even a largely emotional appeal to the jury. Nor can the Court say that the comments were any larger in scale than, or out of all proportion to, those of defense counsel. These comments, however, were not drawn from evidence before the jury. *See Bowen*, 818 F.3d at 191.

Having reviewed both the comments regarding Ms. Lentz and the agents, the Court cannot say that the statements, even if improper, were when considered in the context of defense counsel's arguments, so egregious as to affect the substantial rights of Defendants. The prosecutor's comments were aimed at rebutting extended arguments by defense counsel about why this criminal case was brought, and the ultimate convictions were supported by overwhelming evidence of both Defendants' guilt. Based upon the totality of the record, the Court cannot say that Defendants'

substantial rights were affected by the prosecutor's remarks.  *See id.*

   3.   The prosecutor's statements that he had never convicted an innocent
        person, if improper, did not affect Defendants' substantial rights.

Defendants charge that "the prosecutor falsely claim[ed] that he has never

convicted an innocent person, again, making himself a witness by putting his

credibility in issue."  Mot. [104] at 7. The Government responds that

> [t]he undersigned has no recollection of stating that he has never
> convicted an innocent person and defendant fails to cite this statement.
> Based on memory, the remark was that the prosecutor hopes to have
> never convicted an innocent man and this was in rebuttal after defense
> counsel had in essence stated that the case was trumped up and that the
> agents [sic] and the lawyers' future advancement depended on
> convictions.

Resp. [106] at 3.

In Reply, Defendants state that "since the prosecutor specifically denied

making the following statement," they would quote relevant statements made by

the prosecutor in his rebuttal argument.  Reply [108] at 24.  The Government

counters that

> [c]ontrary to defendant's reply, the government did not "specifically deny"
> making a statement concerning never convicting an innocent person.  In
> our response, and based on memory alone, we stated "the remark was
> that the prosecutor hopes to have never convicted an innocent man." The
> exact quote that defense now offers does not deviate from our response by
> much and was a direct response to scurrilous comments made by defense
> counsel.

2d Resp. [123] at 5.

During closing, Defendants' counsel questioned the motives of Government

agents and the Government's witness Kim Lentz.  On rebuttal, the prosecutor

stated that "I am not here to convict an innocent person.  I have never, to my

knowledge, convicted an innocent person." Tr. [117] at 99.

In *United States v. Garza*, 608 F.2d 659 (5th Cir. 1979), the Fifth Circuit considered comments about prosecuting an innocent man. The prosecutor had argued that "those people (the government agents) and the Government has (sic) no interest whatsoever in convicting the wrong person." *Garza*, 608 F.2d at 664. After defense counsel made a statement about not wanting innocent people going to jail, the prosecutor argued in part that

> if I thought that I had ever framed an innocent man and sent him to the penitentiary, I would quit. Now, I resent the innuendoes that I would stand up here and try to send an innocent man to the penitentiary, and that's what it was. I resent that because it's simply not true because, believe you me, there is presently enough work to do without fooling around with innocent people. Plenty enough. All over the place.

*Id.* at 662. The Fifth Circuit found the remarks to be improper closing argument which substantially prejudiced the defendant's right to a fair trial. *Id.*

According to the Fifth Circuit,

> [i]t is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant.
>
> > The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.

*Id.* at 663 (quoting *Hall v. United States*, 419 F.2d 582, 583-84 (5th Cir. 1969)).

The Fifth Circuit recognized that an argument that a prosecution would not

have commenced, or that the prosecutor personally would not have participated in a prosecution, unless it had already been determined that the defendant was guilty, was improper. "This entire line of argument presumed that the whole government apparatus, and the prosecutor individually, had reached a determination of the defendant's guilt before the trial and implied that the jury should give weight to this fact in making its determination." *Id.* at 665. "The prosecutor may neither dispense with the presumption of innocence nor denigrate the function of the trial nor sit as a thirteenth juror." *Id.* (quotation omitted).

"[E]xcept to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *United States v. Bowen*, 818 F.3d 179, 191 (5th Cir. 2016) (quotation omitted). According to the Fifth Circuit, "[w]hile any single statement among those [it] isolated might not be enough to require reversal of the conviction and, indeed, some clearly would not [the Court thought] it beyond question that the prosecutor's improper comments, taken as a whole, affected substantial rights of the defendant." *Garza*, 608 F.2d at 665. The *Garza* Court concluded that, "at some point the transgressions of this prosecutor cumulated so greatly as to be incurable," and any curative instruction cannot "unring a bell." *Id.* at 666. Nevertheless, even if improper, a statement which does "not cast serious doubt on the correctness of the jury's verdict" does not entitle a defendant to a new trial. *Bowen*, 818 F.3d at 191.

In this case, even if the prosecutor's "innocent person" comments, which were also in response to the comments made by Mr. Bennett's counsel in his closing, were

improper, Defendants have not shown that their substantial rights were affected. Defendants have not overcome the "substantial burden" of showing that the prosecutor's improper comments constituted reversible error. *Virgen-Moreno*, 265 F.3d at 290.

There was an overwhelming amount of evidence in this case against Defendants, such that the prosecutor's remarks, even if improper, do not cast serious doubt on the correctness of the jury's verdict. Considering the prosecutor's remarks in the context of the entire trial and in light of the argument to which they were responding, and attempting to ascertain their intended effect, the magnitude of any prejudicial effect was not substantial. *See Virgen-Moreno*, 265 F.3d at 291; *Canales*, 744 F.2d at 424. Defendants are not entitled to a judgment of acquittal or a new trial on this basis. *See Bowen*, 818 F.3d at 191; *Valas*, 822 F.3d at 243.

4. The prosecutor's comment about his salary did not affect Defendants' substantial rights.

Defendants argue that the prosecutor "discussed his own salary, injecting his credibility yet again." Mot. [104] at 8. According to the Government, "[a]ny reference to the prosecutor's salary would . . . have been a statement along the lines that our salary is not dependent on the outcome of this trial: a direct rebuttal to the scurrilous claim to the contrary." *Id.* at 3 n.4.

In rebuttal to defense counsel's statements regarding Lentz's and the agents' motives, the prosecutor stated "[m]y salary is the same whether those people go home or they go to jail." Tr. [117] at 99. While it is not completely clear why the prosecutor interjected a comment about his salary into his rebuttal, it appears that

-42-

it was in response to defense counsel's comments about the bias of certain Government witnesses and agents questioning why the criminal case was brought against Defendants.  Mr. Bennett's counsel argued that "they're here because either they believe, wrongfully, or they just sunk their teeth in it so bad that they've got to get a conviction of Jerry Bennett, no matter what it takes." Tr. [117] at 86.  While defense counsel appeared to be referring to the agents, rather than to the prosecutor, it may have been this portion of defense counsel's argument to which the prosecutor was responding.

The Court has found no controlling legal authority directly on point which addresses a comment by a prosecutor about his salary.  Nor have the parties directed the Court to any authority on this issue.  However, in general, "[a] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence."  *Smith*, 814 F.3d at 277 (quotation omitted).  To the extent that the comment was improper, however, the Court finds that the evidence of Defendants' guilt was such that, when considered in the context of Defendants' closing arguments to which the prosecutor was responding, any improper comment in this regard did not affect Defendants' substantial rights.

5. <u>The prosecutor accurately stated the law regarding the Government's burden of proof, and even if improper, the prosecutor's remarks concerning Defendants' burden-of-proof chart did not affect Defendants' substantial rights.</u>

Defendants maintain that the prosecutor falsely charged that a chart used in Ms. Bennett's closing argument depicting

> evidentiary hierarchy which set forth the standards below "reasonable doubt," including "highly likely," "likely," etc., incorrectly depicted the burdens less that [sic] "beyond a reasonable doubt" thus, falsely misrepresenting the law and making himself a witness.

Mot. [104] at 7-8.  Defendants have attached the chart as Exhibit "B" to their

Motion [104].  According to Defendants,

> [t]he prosecutor did not merely argue his position, but instead, abused his position as a U.S. Attorney to claim that the chart was an incorrect statement of law.  The trial judge further complicated this error when it refused to correct the prosecutor, as it did when the prosecutor objected to the defendant's argument regarding the dismissal on directed verdict of Mr. Bennet's' [sic] few counts.  The court actually chastised defense counsel and quoted the legal authority as to why it believed the defense was in error, whereas, it refused to do the same with the prosecutor.

*Id.* at 8.

> The Government responds that

> Defendants' claim concerning the beyond a reasonable doubt standard will likely also not survive reading of the transcript.  The prosecutor referred the jury to the jury instructions for the proper standard.  That can hardly be prejudicial.

Resp. [106] at 3.

> In their Reply, Defendants maintain that the Government made a

"misstatement" in its rebuttal argument "which prompted another objection . . . ."

Reply [108] at 25.  In its second Response, the Government maintains that

> Defendant's argument about their beyond a reasonable doubt chart is nonsensical.  Defendant complains that the government directed the jury to Instruction 3 . . . which is the instruction in which the Court explained the burden of proof.  There is nothing objectionable in the government's rebuttal on this point.

2d Resp. [123] at 5 (footnote omitted).

> During Ms. Bennett's closing argument, her counsel stated that

[a]s you can see here, we kind of constructed a chart that we like to use. And before you can change your not guilty verdict with respect to any count, you've got to find that that evidence was so strong, so convincing, so persuasive, that if it's -- for example, if it's you know, unlikely, possibly, suspected, probably guilty, guilty likely, even if it's guilt highly likely, that what the government wishes and needs to prove to you, even if it's highly likely that you should change your not guilty verdict, it's all not guilty. It's only if you get past this big red line right here to show guilt beyond a reasonable doubt that you can change that verdict (indicating).

Now, I want to -- I need to go over -- before I go back into the evidence, I've got to talk about what does the government have to prove.

Tr. [117] at 38-39. Mr. Bennett's counsel also referred to the chart in arguing that the Government had not proved the charges against Mr. Bennett beyond a reasonable doubt. *Id.* at 73.

The prosecutor responded as follows in rebuttal:

Now, the last thing I want to say, because there's an awful lot more in my notes and I can't get to any amount of them, the defendants really loved that little chart that they showed. They both showed it to you. And their idea of what was reasonable doubt and what's not reasonable doubt is fine, but there's an instruction, it's Instruction Number Three, and the Court told you what reasonable doubt is. And that's what you ought to follow, not some chart that -- I don't know where it came from. I guess since both of them used it, most defense lawyers must have it. But the actual instruction is written in Instruction Three.

*Id.* at 104-05.

The prosecutor referred the jury to the Court's instruction on reasonable doubt, which was an accurate statement of the law and was not an improper comment. *See* Tr. [116] at 223-24. Even if the statements regarding defense counsel's burden-of-proof chart were improper, Defendants were not prejudiced, and their substantial rights were not affected.

-45-

6.     The statements about Defense counsel's alleged misrepresentations, even if improper, did not affect Defendants' substantial rights.

Defendants argue that

[t]he prosecutor abused his authority as a U.S. Attorney, and injected his credibility in the case, improperly making himself a witness by telling the jury that "I've only got eight minutes remaining for rebuttal and I don't have enough time to contradict all the misrepresentations about the facts that you've heard over the last two hours . . . ."  The prosecutor knew that he was following hours of argument by two attorneys, and he knew that he would need more time, but he abused his position by making such a claim.

Mot. [104] at 8.

The Government counters that

Defendants are correct that the government should have reserved more time in order to rebut the misrepresentations and the scurrilous claims about the agents['] and lawyers' motives.  But defense leaves out the very next line (according to undersigned's recollection) in which the government said "I leave that to your collective memory."  This is only prejudicial in the sense that the jury's collective memory agreed with the government's statement.

Resp. [106] at 3.

The Fifth Circuit "has repeatedly held that '[n]o prosecutor . . . may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant . . . .'" *United States v. Valas*, 822 F.3d 228, 245 (5th Cir. 2016) (quoting *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980)).  The Fifth Circuit has held that summarizing an opponent's argument with "blah, blah, blah," is substantially dismissive and unprofessional. *Id.*  However, in that case, the Fifth Circuit held that there was no reversible error because the comment was not so improper as to affect the defendant's substantial

rights.  *Id.*

In the present case, the prosecutor's argument referencing misstatements of defense counsel does not appear to be a disparagement of, or a personal attack on, defense counsel's integrity, but instead was directed at defense counsels' arguments themselves and attacked the strength of the defense on the merits.  *See United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002).  The Fifth Circuit has also provided the prosecutor "some latitude" when defense counsel make wild accusations in closing arguments, such as accusing the Government of "paying for" some of its witnesses.  *See id.*

The Government's rebuttal argument in this case appears to be a request of the jury to focus on the relevant factual issues at trial.  Moreover, the Court admonished the jurors several times during trial that what the attorneys said was not evidence, Tr. [110] at 25, 26; Tr. [115] at 99; Tr. [116] at 224; Tr. [117] at 3, 109, and the jury is presumed to have heeded the Court's instructions.  Given the strength of the Government's case against Defendants, the Court cannot say that these remarks could have denied either Defendant a fair trial.  *See id.*

> 7.  <u>The prosecutor's comments in closing which Defendants assert were not supported by any evidence did not affect Defendants' substantial rights.</u>

Defendants argue that

[t]he prosecutor made many detrimental false claims against the defendants, which had never had any proof to support his claims through the trial, some of which are as follow:
1.      That Sherrie Bennett "put herself on as Dr. Lines power of attorney."  The only evidence regarding the power of attorney, was that Dr. Lines has his own, long time attorney, whom he met many times on

his own, and he prepared the power of attorney without Ms. Bennett's presence.

2.      That Sherrie Bennett "made herself beneficiary of Dr. Lines will;"

3.      That Sherrie Bennett "made Dr. Lines buy a house next to her and live there, where she kept him in squalor to control him;"

4.      That Sherrie Bennett drive [sic] Dr. Lines to put herself on the will;"

5.      That Sherrie Bennett had medical power of attorney over Dr. Lines, and that she put herself over his medical legal authority;"

6.      That Sherrie Bennett put herself as beneficiary of two million dollar life insurance policies.

Mot. [104] at 8.[7]  Defendants maintain that "[n]one of the above had any proof, however, the prosecutor repeated the false claims numerous times." *Id.*

Defendants assert in their Reply [108] that these misstatements were made in the prosecutor's opening statement, but they do not cite specific portions of the transcript.  Reply [108] at 23.  The Government maintains that statements "about the Bennett's [sic] being placed on the will, given power of attorney etc. were supported by the record in the case."  2d Resp. [123] at 4.

The portions of the prosecutor's opening statement to which Defendants appear to refer are as follows:

> And here is what was going on:  Starting in 2007, Mr. and Ms. Bennett got Dr. Lines to agree to make him their power of attorney.  And then in 2008, as they began to work on this clinic out at Cedar Lake, they needed to issue two separate life insurance policies.  There were two separate $1 million life insurance policies. The first -- they're both from AIG Insurance Company, and the first was set to secure the mortgage on this building that they were building, and so it was assigned if something should happen to Dr. Lines that it should go to the mortgage company.
>   The beneficiaries were first, I think the company and then second, the estate of Dr. Lines, that is, if he passed away, what was left of his

---

[7]  While Ms. Bennett's counsel employs quotation marks, these do not appear to be direct quotes from the trial transcript.

assets.

The second life insurance policy was assigned to a company called DLL, De Lage -- I've forgotten exactly what it is, but they're essentially the company that was leasing the huge piece of radiology equipment to the clinic.  An oncology clinic is dealing with sending radiation into a tumor, and so it's a fairly extensive piece of equipment and a very expensive piece of equipment.   And that life insurance policy was assigned to DLL, and the first beneficiary was the Estate of Laurence Lines.

Then in 2009, the oncology clinic opened up.  I think it was around January of 2009.  And during that same year, Mr. and Mrs. Bennett had themselves appointed as medical power of attorney for Dr. Lines to make final decisions if he couldn't make final decisions for himself.  In that same year, Mr. and Mrs. Bennett had the life insurance policies changed to have them as the beneficiaries on both policies.  They're still assigned to the mortgage and to DLL, but anything that's leftover from it is now they are -- and I had never heard this term before, but according to the insurance company -- irrevocable beneficiaries of this life insurance policy.  That was in 2009.

Also in 2009, Mr. and Mrs. Bennett had Dr. Lines moved from his home in Moss Point to a home next to them in Vancleave.  Now, I found it interesting during voir dire that Mr. Crosby would back away from the term "caregiver," and I can understand why, because in July of 2013, when he was finally -- and I can't think of a better word -- "rescued" from that home in a state of degradation, I can understand why they would not want to take credit for that.  But that's what you're going to see what happened in this case running into 2013.

Tr. [110] at 33-35.  Defendants did not object to any of the prosecutor's opening statement.

"The prosecutor's opening statement should be an objective summary of the evidence reasonably expected to be produced . . . ."  *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988).  This objective summary, however, does not allow the prosecution to refer to evidence of questionable admissibility, *United States v. Hernandez*, 779 F.2d 456 (8th Cir. 1985), or evidence unsupported at trial.

*United States v. Novak*, 918 F.2d 107, 109 (10th Cir. 1990) (cited with approval by the Fifth Circuit in *United States v. Valencia*, 600 F.3d 389, 410 (5th Cir. 2010)).

The foregoing portion of the prosecutor's opening statement in this case

represented a roadmap of what the Government indicated would be its case-in-chief.

This summation included what the Government believed the evidence it intended to

produce at trial would demonstrate, including reasonable inferences or conclusions

that could be drawn from the evidence.

Evidence pertaining to these statements was introduced at trial, and the jury

was free to accept or reject that evidence.  The evidence against Defendants was

strong.  Moreover, the Court instructed the jury multiple times during trial that the

statements of the attorneys were not evidence.  *See* Tr. [110] at 25, 26; Tr. [115] at

99; Tr. [116] at 224; Tr. [117] at 3, 109.  Even if these opening remarks were

improper, Defendants have not shown that their substantial rights were affected.

To the extent that Defendants' Motion relies upon these alleged misrepresentations

in the prosecutor's opening statement, the Motion will be denied.

> 8.    Even if improper, the prosecutor's reference in his opening statement
> to Ms. Bennett's brother dying as the result of a drug-induced car
> accident did not affect Defendants' substantial rights.

Defendants maintain that the prosecutor improperly stated

> in opening statement that [Ms. Bennett's] brother died as a result of a
> drug induced car accident, after a prospective juror discussed his inability
> to be impartial because of his experience with the same as a medical
> professional, and due to the fact that the evidence supporting that
> argument was not allowed.

Mot. [104] at 8.

The Government responds that

> [t]o the extent that Mrs. Bennett's brother's death was mentioned in
> opening we did not anticipate a ruling not admitting it later in the trial.
> Of course, defendants were well aware that Henry Box had died in a
> single car accident with opiates in his blood stream on the very day he

> obtained his final prescription from Sherrie Bennett. Defendants made
> no *in limine* motion that would have obtained a pre-trial ruling on
> admissibility and the prosecution's mistake is hardly consequential in
> light of the overwhelming evidence against the Bennetts.

Resp. [106] at 3. According to the Government, "[i]t would have been fair for

defendant to point out the discrepancy between the proof and what was stated at

opening. Defendants made the strategic choice not to do so." *Id.* at 3 n.5.

When discussing $30,000.00 cash that Ms. Bennett had in the trunk of her

vehicle and attempts "to figure out what happened to that cash," the prosecutor

stated in opening the following regarding Ms. Bennett's brother:

> On April 6th, her brother, Henry Box, who was one of the recipients of an
> awful lot of these narcotics, had a single-car accident in Ocean Springs or
> somewhere over in Jackson County. At the time, he was -- according to
> the toxicology report, he had opiates and cocaine in his system. That was
> on April 6th. That was the day he picked up his last prescription from
> Sherrie Bennett. He passed away on April 9th. On April 10, $7,750 in
> cash is deposited into their Navigator account, and immediately a check
> is written from that account for the same amount to Heritage Funeral
> Home. That's the only amount of that $28,000 we've been able to trace.

Tr. [110] at 47. Defense counsel did not raise any objection to the prosecutor's

opening statement.

On a recess during the Government's case-in-chief, Ms. Bennett's counsel

raised the issue of Henry Box's medical records outside the presence of the jury.

*See* Tr. [114] at 137. Ms. Bennett's attorney objected to the records under Federal

Rules of Evidence 401, 403, and 404(b). *Id.* at 137-38. Before the Court resolved

the objection, the prosecutor announced,

> Your Honor, I'm going to stay clear of the medical records. It's clear he
> got the prescription. It's clear that he died in a single-car accident. That
> testimony will come out. I don't need to show his toxicology report.

*Id.* at 140.  The Court announced that if the issue came up again, it would "address it accordingly."  *Id.*  It does not appear that the Government sought to introduce the records again.

The Government brought to the Court's attention, outside the presence of the jury, that it intended to ask Agent Mary Flinchum about Henry Box being involved in a single-car accident.  Tr. [114] at 140-41.  The Government proposed Flinchum "just making that simple statement from her review of [the medical records and police reports], that he did expire, there was a single-car accident on the evening of April 6th that Henry Box was involved in, and that he died from those injuries."  *Id.* at 141.  The Court overruled Defendants' objection to this proposed line of questions, *id.* at 142, but the Government ultimately did not pursue this with Flinchum.

The prosecution may not refer to evidence of questionable admissibility or evidence unsupported at trial during its opening statement.  *Novak*, 918 F.2d at 109.  In this case, the Government never actually offered Henry Box's medical records for admission and did not question Agent Flinchum about Henry Box's car accident or death.  The parties have not cited any controlling authority on this point.

Even if the Government's statement in opening regarding Henry Box was improper, however, the Court is not persuaded that Defendants have shown that they were prejudiced.  The comment regarding Henry Box came during opening statements and was not referred to again in the jury's presence during the nearly

-52-

two-week long trial.  Nor did the Government "attempt to press any improper insinuation to its advantage later in the trial." *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008) (concerning opening statement urging jury to convict a defendant in order to "end the cycle of violence" on the Southern Ute Indian Reservation).  The Court also instructed the jury on several different occasions that what the attorneys said was not evidence.  Tr. [110] at 25, 26; Tr. [115] at 99; Tr. [116] at 224; Tr. [117] at 3, 109.  Morever, the evidence of Defendants' guilt was overwhelming. Any improper comment regarding the cause of Henry Box's untimely death in a motor vehicle accident did not affect Defendants' substantial rights.

Defendants' arguments regarding the prospective juror are misplaced. Neither the prospective juror who expressed the opinions regarding Ms. Bennett, nor his daughter who also happened to be on the jury panel, were ultimately selected for the jury.  The comments made by the prospective juror were also held at a bench conference during voir dire, outside the hearing of the rest of the jury panel. Defendants can therefore claim no prejudice from this exchange with the prospective juror.

9.   <u>In sum, Defendants have not shown that the prosecutor's comments or conduct affected their substantial rights or cast serious doubt on the correctness of the verdict.</u>

The Court has also considered the cumulative effect of the prosecutor's comments.  *See United States v. Smith*, 814 F.3d 268, 275-76 (5th Cir. 2016); *Gracia*, 522 F.3d at 603.  Having reviewed the entirety of the record and the prosecutor's argument in context, Defendants have not shown that the prosecutor's

conduct affected Defendants' substantial rights or cast serious doubt on the
correctness of the verdict. Where there are "numerous witnesses, pieces of
evidence, and issues placed before the jury," the Fifth Circuit has declined to say
that "the prosecutor's statements overshadowed what had come before and unduly
prejudiced the [defendants'] case." *United States v. Gallardo-Trapero*, 185 F.3d 307,
320 (5th Cir. 1999). To the extent that Defendants rely upon alleged prosecutorial
misconduct based upon opening statements and/or closing or rebuttal arguments,
Defendants' Motion will be denied.

I.     The alleged deficiencies in the discovery provided by the Government do not
       warrant setting aside the verdict or granting a new trial.

       Defendants ask the Court to set aside the verdict and grant a new trial based
upon certain discovery provided to them by the Government. The discovery at issue
is

> [a] list of names . . . provided to [Government witness] Ms. Shoemaker by
> Agent Sandifer. It was a list of names that Dr. Lines had prescribed
> medication to. Ms. Shoemaker wrote "No" out to the right of the names
> of those people that were not patients at Cedar Lake Oncology Center.

Report of Investigation [104-1] at 8; *see* List [104-1] at 9-13. Defense counsel cross-
examined Ms. Shoemaker about the list at trial. Tr. [114] at 45-46, 62. According
to Ms. Shoemaker, 30 people on this list were not patients of the Clinic to the best
of her knowledge, based upon her research. *Id.* at 46.

       Mary Flinchum, an agent with the Mississippi Bureau of Narcotics assigned
to the DEA Tactical Diversion Squad, testified that she and agent James Pacheco
were able to determine that roughly 25 of the names on the list had received

prescriptions from a Dr. Lawrence Line, rather than the Dr. Laurence Lines for whom Ms. Bennett worked. Tr [114] at 146. Agent Flinchum went to each pharmacy and pulled the original prescriptions and determined that these individuals had not been given a prescription by Dr. Laurence Lines, but by a different doctor named Lawrence Line. *Id.*

> Defendants argue that
>
> [t]he jury's verdict should be set aside and a new trial granted because the discovery provided by the government was false and mislead [sic] the Bennetts into believing that Dr. Lines had prescribed pain medication to over 30 people who were not cancer patients, and after the defense presented evidence to the jury, the government, without notifying the defense, produced contradictory evidence that seriously damaged the defense, thereby requiring a new trial.

Mot. [104] at 9. Defendants refer to Exhibit "C" to their Motion in support of their argument. *Id.* Defendants maintain that they were provided discovery from the Government, on which they relied to formulate a defense strategy. *Id.*

> The discovery stated that the case investigators compiled a list of people to whom Dr. Lines had prescribed pain medications. The list was first presented to Shoemaker, and she identified over 30 people who were not patients of the clinic. Although some of those patients were family members of the Bennetts, some were also family members of Shoemaker, and numerous other people. The defense intended to demonstrate that Dr. Lines was a multi-board certified doctor, who helped many people beyond cancer patients, and he did not keep medical charts on many people, despite regulations. However, to the horror and shock, and demise of the defense strategy, the government sponsored a witness (who was allowed to remain in the court room during the entire trial)[8] who claimed, for the first time during the testimony, that the Dr. Lines was not Dr. Lines, but instead, a different Dr. Lynes [sic] from Hattiesburg. Thus, it undermined the entire defense case, without notice, and with a

---

[8] Defendants appear to be referring to Agent Flinchum, who was the case agent on the drug-related charges.

witness the government sponsored.  This was wrong and unjust.  This is reversible error.

*Id.*

The Government responds that

[i]t is true that [Defendants] were wrong, as was the government, about that document.  Through the use of the PMPs, the government identified 104 individuals getting controlled substances from Dr. Lines.  Cross-checking with the Clinic we determined that a large number of them were not patients of the clinic.  As we prepared for trial we were concerned that this was a much larger pill operation than merely the Bennett family members and so an agent physically drove to each pharmacy where these prescriptions were filled, pulled the prescriptions and determined that the entries by pharmacists had misidentified the doctor writing many of these prescriptions.  This information was shared with defense counsel.  [In fact, undersigned provided counsel opposite an estimate of the drug quantities that would be used in sentencing based on just the family members after this was determined. The government also offered Jerry Bennett a plea to a potential probationary sentence only after determining that he was not involved in a much bigger pill distribution network.    Undersigned distinctly remembers this conversation with Mr. Carlisle (Mr. Bennett's counsel) and strongly believes he had the same conversation with Mr. Crosby (Ms. Bennett's counsel).]  That defendants built their defense around this document seems unlikely.  Violating the law many times does not exonerate one for violating it a few times.

Resp. [106] at 5.

Defendants reply that

[t]he above referenced list provided the defense with an effective strategy.  If Dr. Lines, who was a duly licensed and board certified physician in many different fields, had on many occasions, at the admission of the government documented by its own investigation, proved that Dr. Lines had prescribed pain medication to many people, who he did not examine not [sic] have them as patients at the oncology clinic, it would prove that Ms. Bennett did not direct Dr. Lines to provide her family with pain medication, and instead, demonstrated that Dr. Lines saw fit to treat patients where he found them and when he decided to do so, which further demonstrated that he was in control of his own decision making regarding the treating of patients beyond his clinic.  The undersigned

considered this a powerful argument.

Reply [108] at 29.  According to Defendants,

> making a plea offer, and offering to base the recommendation only upon
> the pills prescribed to a particular defendant, is not the same thing as
> bringing a major discrepancy and FALSE statement in the investigation,
> impacting a major piece of exculpatory information to the attention of the
> defense.  To be clear, the prosecutor DID NOT inform either one of the
> defense counsel about the FALSITY of the investigation contained in the
> discovery prior to disclosing it through the testimony of its witness during
> the middle of the trial, and after the undersigned make its point
> through Shoemaker.

*Id.* at 31.  Defendants maintain that they "were misled into believing, and not told

otherwise, that the doctor prescribed to many many non cancer patients of the

clinic, and the Bennetts had nothing to do with it."  *Id.*

> In its second Response, the Government points out that

> [t]here is no allegation here that the government did not provide defense
> with the list in question . . . .  Both defense and the government were
> under the impression that the list included individuals that had gotten
> prescriptions outside of the clinic from Dr. Lines.  Because the
> government believed (and proved decisively) that Dr. Lines was
> incompetent during this period, the government further investigated the
> list and determined that most of these individuals had not received a
> prescription from Dr. Lines but had shown up on the Prescription
> Monitoring Program readout through entry error by pharmacists.
> [Defendants claim that was not shared with them prior to trial.
> Undersigned distinctly remembers discussing it with  Mr. Carlisle (Mr.
> Bennett's counsel) and believes he had the same conversation with Mr.
> Crosby (Ms. Bennett's counsel).]  That information was shared prior to
> trial although defense counsel denies having been informed of that fact.
> Regardless of differing memories, it is clear defense counsel made no
> effort to investigate this information.  If this was so key to their defense
> why was no effort made to locate any of these individuals that defense
> believed were getting prescriptions outside the clinic from a "competent"
> Dr. Lines?  Just as in the case of the evasive doctor and the fishing
> expedition storage facility, defense's lack of investigation does not equate
> to prosecutorial misconduct.  Defense's claim that this document was
> exculpatory is inaccurate.

2d Resp. [123] at 5-6.

Defendants do not cite any specific legal authority in support of their argument. Defendants have not shown that the evidence in question, which is that certain prescriptions were in fact issued by a Dr. Lawrence Line, rather than Dr. Laurence Lines, was somehow exculpatory or impeaching. Under Defendants' theory, the fact that Dr. Lines may have written improper prescriptions to others beyond Defendants and their family members would not change the fact that the jury concluded the prescriptions to Defendants and their family members were improper. Defendants were given the list by the Government, and both Defendants and the Government were equally mistaken about it. This was not a case of the Government itself fabricating or actively attempting to conceal evidence from Defendants. Moreover, the prosecutor believed that, when the mistaken interpretation was discovered at the eleventh hour, he had shared this information with defense counsel.

Because this evidence arguably turned out to be inculpatory, as it tended to show that the vast majority of people who were receiving prescriptions under Dr. Lines' name, but who were not patients at the Clinic, were Defendants and their family members, the Court is not persuaded that *Giglio v. United States*, 405 U.S. 150 (1972), or *Brady v. Maryland*, 373 U.S. 83, (1963), apply here. Nor have Defendants demonstrated that they are otherwise entitled to any relief on this basis.

J.    There was no judicial bias in this case.

Defendants next assert that the Court exhibited judicial bias in this case.

The trial judge stated on the record, albeit to the government's attorney, that his key pet peeve was when the jury's time was wasted. The judge then thereafter entertained what he considered a waste of time, due to the defense's constitutional objections to the 5th amendment violations, and actually stated so on the record. The trial judge's irritation was obvious to the jury, and the demeanor and attitude of a trial judge, if negative toward one side or the other, is detrimental to fairness and justice. The trial judge was irritated with the undersigned, as can be demonstrated by his direct comments on the record, and the cutting off of the undersigned's attempts to explain the objection to the court, numerous times, at side bar, and reflected in the transcript. The trial judge's offer to cure the prosecutor's claim that medical records were not produced because they did not exist, which misrepresented the facts and was contradicted by the judge's denial of the defendant's attempt to secure said records before trial, when the judge offered to tell the jury about the defendant's request but also tell the jury why he denied the request, but then refused to follow through on said offer, further demonstrated the judge's irritation toward the defense. Further, the judge's refusal to correct the prosecutor's additional misstatements during closing argument, especially with respect to the beyond a reasonable doubt chart, caused the appearance of siding with the prosecution, especially because the trial judge sustained the prosecutor's argument regarding the defense argument for "tossing out" certain charges of Mr. Bennett. This behavior was viewed by the jury, and operated to cause an unfair trial to the defendants.

Mot. [104] at 9-10. In their Reply [108], Defendants maintain that Ms. Bennett's counsel "correctly stated the standard for the judge's dismissing some claims of Mr. Bennett," "sustained the prosecutor's erroneous objection," and "actually chastised the undersigned during closing argument, before the jury, and stated that [counsel's] legal interpretation was wrong, in that Rule 29 of the FRCP was the law and [counsel's] interpretation was wrong." Reply [108] at 31-32.

In its second Response, the Government asserts that

> Defendant's claim of judicial bias is predicated essentially on the fact that the Court ruled against many of defendant's objections.  That the Court properly ruled on these objections negates any claim of judicial bias.

2d Resp. [123] at 6.

> At trial, Ms. Bennett's attorney argued in closing that

> in Instruction 19 as it concerns Counts Two through 11, as to the co-defendant, Counts Two, Three, Four, Five, Six, and Nine of the indictment, you'll notice that Seven, Eight, Ten, 11 are omitted.  You got all the way through this trial with us -- with Sherrie and Jerry both being charged -- and after the government puts on its best case, there's not even - - not even a scintilla sufficient of evidence to justify Jerry Bennett still being charged in these indictments.  It's thrown out, thrown away.  You can be an indictment [sic] if there's still an allegation or, like, something that's still -- that within the realm of possibility.
> MR. MEYNARDIE:          Your Honor, that misstates the law.
> THE COURT:               Response?
> MR. CROSBY:              It absolutely is consistent with the law.  It has to be so insufficient, so unworthy to remain in there, or else Jerry Bennett would still be on trial right now for those counts.
> THE COURT:                Well, the standard is not whether there is a scintilla sufficient at that stage of the case.  The standard is set by Rule 29, so let's move on.
> MR. CROSBY:              Yes, sir.

Tr. [117] at 42.

"[I]n determining whether a trial judge overstepped the bounds of acceptable conduct-that is, violated his duty to conduct the trial impartially," the Fifth Circuit has held that it must "view the proceedings as a whole."  *United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988) (citing *United States v. Williams*, 809 F.2d 1072, 1088-89 (5th Cir. 1987); *United States v. Carpenter*, 776 F.2d 1291, 1294 (5th Cir. 1985)).  "[E]ven a comment arguably suggesting a judge's opinion concerning guilt is not necessarily reversible error but must be reviewed under the totality of

the circumstances, considering factors such as the context of the remark, the person to whom it is directed, and the presence of curative instructions." *Id.* "As a general rule, a defendant complaining of judicial bias must demonstrate that the error was substantial and that it prejudiced his case to obtain a reversal of his conviction." *Id.* (quotation omitted).

There is no allegation here that the Court made a comment arguably suggesting its opinion concerning guilt. As for the Court's comments, made outside the presence of the jury, regarding not wanting to waste the jury's time, the Court did not exhibit any bias in this regard. As defense counsel points out, the specific comment he references was actually directed at the prosecutor. "Federal judges have wide discretion with respect to the tone and tempo of proceedings before them; they are not mere moderators or hosts at a symposium." *United States v. Adkins,* 741 F.2d 744, 747 (5th Cir. 1984) (quotation omitted). A judge "may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion." *Id.* (quotation omitted). In this case, the transcript reflects that the Court did not stray from neutrality, and Defendants were not denied a constitutionally fair trial in this regard. *See id.*

In addition, the Court appropriately instructed the jury that, "[e]xcept for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your verdict." Tr. [116] at 225. Defense counsel's representation that certain substantive counts were dismissed as to Mr. Bennett because there was "not even a scintilla sufficient of evidence to justify Jerry Bennett

still being charged in these indictments," Tr. [117] at 42, was a misstatement of the

law.  The correct standard is "whether a rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *United States v. Grant*,

683 F.3d 639, 642 (5th Cir. 2012).  Accordingly, no error was committed by the

Court in referencing the correct legal standard.  Nor were Defendants prejudiced by

this or any other statement made by the Court.

K.    <u>Defendants' request for new trial based upon new information will be denied.</u>

Defendants argue that

[b]efore the trial, the Bennetts attempted to serve a subpoena upon a
witness, but could not locate Anita Bonner Cotton.  She was expected to
be a witness to the competence of Doctor Lines and the problems
associated with racial misconduct and pornographic computer activity.
She worked in the clinic.  She had moved months before the trial, and her
husband worked offshore.  She could not be located.  We attempted may
[sic] ways to contact her, but one effort involved Facebook.  I left my
number and a desperate message for her to contact me. After the
conviction, she did contact me.  She would have been a valuable witness.
The court might consider her testimony unavailable at this time,
however, the Bennetts had the right to expect the witness of the
government to tell the truth.  The [sic] did not, and the affidavit is very
powerful.  Finally, if for no other reason, the court could consider the
content of the affidavit as it concerns sentencing, if it so chooses.

Mot. [104] at 12.  Ms. Cotton's Affidavit is attached was Exhibit "D" to Defendants'

Motion [104].

The Fifth Circuit has held that

[i]n order to receive a new trial on the basis of newly discovered evidence,
the defendant must demonstrate that:  "(1) the evidence is newly
discovered and was unknown to the defendant at the time of trial; (2)
failure to detect the evidence was not due to a lack of diligence by the
defendant; (3) the evidence is not merely cumulative or impeaching; (4)
the evidence is material; and (5) the evidence introduced at a new trial
would probably produce an acquittal."

*United States v. Franklin*, 561 F.3d 398, 405 (5th Cir. 2009) (quoting *United States v. Bowler*, 252 F.3d 741, 747 (5th Cir. 2001)).

Defendants have not shown that Ms. Cotton's testimony is newly discovered or that it was unknown to them at the time of trial. In fact, when Ms. Bennett testified on cross-examination about Dr. Burleson, another doctor who worked at the Clinic, being terminated, she testified that Ms. Cotton had heard Dr. Burleson make racial slurs at the Clinic and had reported this conduct to Ms. Bennett. Tr. [116] at 117-18. Ms. Cotton's purported testimony was obviously known to Ms. Bennett and was therefore not newly discovered or unknown prior to trial.

Nor have Defendants shown that the failure to procure Ms. Cotton's attendance at trial was not due to a lack of diligence. Defendants make a conclusory allegation that they "attempted many ways to contact her, but one effort involved Facebook." Mot. [104] at 12. Defense counsel "left [his] number and a desperate message for her to contact [him]." *Id.* Defendants have not explained what other methods of locating Ms. Cotton they employed, and the Court is not persuaded that sending a message over a social media platform constitutes a sufficient showing of diligence. Defendants did not bring the difficulty in locating Ms. Cotton to the Court's attention until the filing of this post-trial Motion. Finally, the record as a whole easily supports a finding that this evidence would not "probably produce an acquittal." *See Franklin*, 561 F.3d at 405. Defendants' request for a new trial based upon this purportedly new evidence will be denied.

III.   CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result.  The Court concludes that Ms. Bennett's Motion [104] for Judgment of Acquittal or Alternatively, Motion for New Trial and Mr. Bennett's Motions for Joinder [103], [105], [109] in Ms. Bennett's Motion [104] should be denied.

**IT IS, THEREFORE, ORDERED AND ADJUDGED**, that the Motion [104] for Judgment of Acquittal or Alternatively, Motion for New Trial Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure filed by Defendant Sherrie Box Bennett, and the Motions for Joinder [103], [105], [109] in said Motion filed by Defendant Jerry Dean Bennett are each **DENIED**.  Neither Defendant is entitled to judgment of acquittal or a new trial.

**SO ORDERED AND ADJUDGED**, this the 6th day of January, 2017.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE